## GILFERT *against* HALLET and BOWNE.

Insurance on goods, at and from New York to Barracoa, with liberty to touch
at one or two ports on the north side of Cuba; the adventure to continue
until the goods are safely landed at Barracoa, and one or two ports on the
north side of Cuba. The vessel arrived at Barracoa the 26th June, and
staid there until the 30th October, 1799, without being able to sell the cargo,
except a small part, and without selling any of the goods of the insured;
and the vessel was forcibly entered by pirates, who carried away 4,780 dol-
lars, in cash, and a great quantity of goods. The vessel set sail for the Ha-
vanna, but was compelled by stress of weather and want of provisions to go
to New Providence, where she arrived the 15th December, where the goods
remaining were sold for 3,701 dollars (the invoice amount of the cargo be-
ing about 16,500 dollars) and the voyage broken up, and an abandonment
made, as for a total loss. It was held, that the stay at Barracoa did not
amount to a *deviation;* that the breaking bulk at Barracoa, did not put an
end to the voyage there, and that the breaking up the voyage at New Pro-
vidence was justifiable, and a sufficient ground of abandonment, so as to
entitle the plaintiff to recover for a total loss.

THIS was an action on a policy of insurance, dated 23d
May, 1799, on goods, on board the sloop Two Friends, " at,
and from New York to Barracoa, with liberty to touch at one
or two ports on the north side of Cuba." The ad-
[*297] venture was to " continue until the goods *were safely
landed at Barracoa, and one or two ports on the north
side of Cuba." The premium was twelve and a half per
cent., to return two and a half per cent. if the voyage ended
at Barracoa.

The vessel sailed from New York on the voyage insured
the 2d June, 1799, and arrived at Barracoa on the 8th June,
and on the 21st October proceeded to Quibera, and arrived
off the harbour on the 23d; when the supercargo went on
shore to go to a town about thirty miles from the harbour,
and the sloop was, in the mean time, to be kept off and on
the harbour. On the 26th, the sloop run into the harbour,
in consequence of a signal; but which proved to be that of
pirates, who came on board and by force took possession of
and plundered the vessel. They took away 4780 dollars in
cash, and a great quantity of goods. On the same day the

supercargo returned, and finding the pirates on board, went on shore on the 28th to procure an armed force, which, however, arrived too late. The pirates left the sloop on the 30th October, and on the 1st November, she set sail for the Havanna, by what was deemed the safest course. In consequence of high winds and a heavy sea, the sloop lost three main shrouds, between the 6th November and the 14th December, one sailor died, and the sloop wanted hands and necessaries ; and the crew being worn out by fatigue, they bore away on that day for Nassau, where they arrived on the 16th December. The sloop had continued at Barracoa, with endeavors, on the part of the supercargo to sell his cargo, but he could only dispose of a small parcel from each invoice, except the plaintiff's, of which he sold none. Several persons had adventures on board. There were nearly twenty American vessels at Barracoa, which staid nearly as long as the Two Friends. The plaintiff's goods were carried to New Providence, and there sold with the cargo that remained. The invoice amount of the whole cargo was about 16,500 dollars, and the net proceeds of the whole sold at Nassau *was 3701 dollars and 31 cents. An    [*298] abandonment was made on the 17th March, 1800.

On these facts, the jury, under the direction of the judge, found a verdict for the plaintiff, as for a total loss.

A motion was made to set aside the verdict, and for a new trial.

*Pendleton* and *Harison*, for the defendants.

*B. Livingston* and *Troup*, contra.

The counsel for the defendants contended, that the risk ended by breaking bulk at Barracoa, or, at least, that the long stay at Barracoa, nearly four months, was unnecessary and amounted to a deviation ; and that staying three days off the harbor of Quibera was also unnecessary, and a deviation ; for the liberty granted in the declaration to touch, was only for information and not for trade ; and lastly, that the vessel might easily have been repaired at New Providence, and gone on, the plaintiff not having lost any of his property.

KENT, J. delivered the opinion of the court. Staying an unusual and unnecessary time at a port will amount to a deviation; (Park, 295;) but I cannot say that this was the case with the vessel in question at Barracoa.(a) The object of the voyage to that place was the sale of the cargo, and the supercargo made endeavors, but to no purpose, to effect a sale. From the facts found, we cannot now intend any unreasonable delay or negligence, on the part of the assured, at Barracoa. We are to consider the supercargo as having tried, from week to week, to sell the cargo, even by [*299] retailing it in small parcels; and that *his long stay there was not singular nor probably unusual, since about twenty sail of American vessels tarried there nearly as long as the sloop Two Friends.

Nor do I consider that the breaking bulk at Barracoa put an end to the voyage or terminated the risk.(b) In respect to the plaintiff's cargo, there was no breaking bulk. But what takes this case out of those that have been cited, (Park, 4th ed. 206; *Still* v. *Wendell*, 6 Term Rep. 531; Millar, 126,) is the special stipulation in the policy, that the adventure was to continue until the goods were safely landed at Barracoa, and one or two ports on the north side of Cuba.

It was evidently the intention of the parties to make this a trading voyage, and that the vessel might go from Barracoa to one or two ports on the north side of Cuba, disposing of the cargo by retail, as the vessel proceeded, within the prescribed course. If the breaking bulk at one port was to put an end to the risk, the language of the policy would have been different. It would have been expressed that the adventure was to continue until the goods were landed at Barracoa, or other port of discharge on the north side of Cuba. This is probably not an unusual provision in our policies of insurance, for in the cause of *Smith* v. *Bates and Waterbury*, which was on a policy to a market in the West Indies,

(a) [Old note.] See *Earl* v. *Shaw*, 1 Johns. Cas. 313. *Smith* v. *Surridge*, 4 Esp. N. P. Rep. 25; and *Suydam and another* v. *Marine Insurance Company* 2 Johns. Rep. 138.

(b) [Old note.] See *Rain* v. *Bell*, 9 East's Rep. 195.

and which was tried at the New York circuit, in 1795; it was shown to be the mercantile usage and sense on the subject, that on a policy to a market, the vessel might go from island to island until the whole of the cargo was sold, without being chargeable with a deviation.(a)

The other stipulation in the policy to return two and a half per cent. if the voyage ended at Barracoa, confirms the opinion that Barracoa was not understood to be, at all events, the *terminus* of the voyage, and the liberty to touch, which, had it stood naked and unexplained in the policy, could not have extended to a liberty *to break bulk,   [*300] must mean leave to trade, and that too subsequent in the order of time to the arrival at Barracoa.

I see nothing, therefore, either in the stay or in breaking bulk, to prevent the plaintiff from recovering. Nor did the stay of three days before and off the harbor of Quibera, amount to a deviation. It was not an unreasonable delay or deviation, in seeking for a market, considering the nature and circumstances of that coast, and the character of the natives.

So while the vessel was on her way to the Havanna, the departure to the island of Nassau arose from necessity; from adverse weather which weakened the vessel, exhausted the necessaries of life, and the strength and competency of the crew.

The only question then is this, was the voyage broken up, so as to justify an abandonment on the arrival of the vessel at New Providence? The whole cargo of the vessel amounted originally to 16,000 dollars; and only a small parcel, probably not amounting to a third of the cargo, was sold at Barracoa. A great quantity of goods and 4780 dollars in cash were lost by the act of the pirates, so that the net amount of the whole cargo remaining, when the vessel arrived at Providence, did not exceed 3701 dollars. Considering the vessel was injured and the necessaries exhausted, owing to the state of the winds and sea, and the cargo so greatly diminish-

(a) [Old note.] See *Maxwell* v. *Robinson and another*, 1 Johns. Rep. 333.

ed by the piracy, I think the voyage may be deemed to have been broken up, and not worth pursuing. The expense of pursuing it, would have exceeded the benefit arising from it. (2 Burr. Rep. 1269. 1 Term Rep. 615.) The remains of the cargo could not justify the re-equipment of the vessel, and a continuance of the voyage ; and the jury were warranted in finding a total loss.

We are, therefore, of opinion that the motion be denied.

Rule refused.(a)

(a) See the note to *Patrick* v. *Ludlow*, *infra*, vol. 3, p. 10.